# IN THE COURT OF APPEALS OF IOWA

No. 22-1807
Filed January 24, 2024

**ANNIE LUKES,**
    Plaintiff-Appellee,

**vs.**

**THE BLUE IRIS, LLC., and JULIE WINTER-HAVEL,**
    Defendants-Appellants.

_____

Appeal from the Iowa District Court for Chickasaw County, John J. Sullivan, Judge.

A retailer appeals the district court's decision finding she breached a noncompete agreement and awarding damages. **AFFIRMED.**

Laura L. Folkerts and Jackson C. Blais of Shuttleworth & Ingersoll, Cedar Rapids, for appellants.

Jeremy L. Thompson of Putnam, Thompson & Casper, P.L.L.C., Decorah, for appellee.

Considered by Tabor, P.J., Buller, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**TABOR, Presiding Judge.**

Once business associates, Julie Winter-Havel and Annie Lukes had a falling out. Lukes bought retail assets from Winter-Havel, and Winter-Havel agreed not to sell clothes in Chickasaw County for three years. But Lukes later discovered that Winter-Havel was helping a competitor sell clothing. When Winter-Havel ignored Lukes's cease-and-desist letters, Lukes sued for injunctive relief. Lukes then amended her petition to seek damages. The court found that Winter-Havel, and her business, The Blue Iris, LLC, breached the noncompete clause and awarded $26,625.49 in damages and attorney fees to Lukes.

Winter-Havel appeals arguing that the court erred first in finding she breached the agreement, and second in calculating damages.[1] Lukes asks for appellate attorney fees. Because the district court properly found a breach of the noncompete clause and its damage assessment was sound, we affirm. We also award Lukes reasonable appellate attorney fees.

## I. Facts and Prior Proceedings

In 2012, Winter-Havel premiered The Bluetique—the only women's clothing store in New Hampton. Winter-Havel had been in the retail business for over twenty years and also owned a floral and gift shop called The Blue Iris.[2] The two stores were just one block apart. In 2015, Winter-Havel hired Lukes to manage The Bluetique. Lukes accepted the job intending to eventually buy the boutique.

---

[1] We will use the name Winter-Havel when referring to the defendants-appellants.
[2] Winter-Havel is the sole owner of The Blue Iris, LLC, under which both her businesses were organized.

As manager, Lukes received advice from Winter-Havel on how to choose inventory by "going to market" several times a year.[3]

In 2018, Lukes realized her goal, purchasing The Bluetique from Winter-Havel for $49,500. Lukes renamed the store Threads. Under their purchase agreement, Lukes took ownership of all business assets except an iPad and laptop. The current inventory stayed, with Winter-Havel receiving eighty percent of the price for each item sold while Lukes kept twenty percent. The agreement also included a noncompete clause, which restricted Winter-Havel from marketing women's clothing in Chickasaw County for three years starting October 1, 2018.[4]

Lukes and Winter-Havel worked amicably under this arrangement until 2020. That spring their business relationship deteriorated. In May 2020, Winter-Havel let Lukes know that she would not be buying any new merchandise for the store. Winter-Havel also told Lukes that Cindy Kotz, a local cosmetologist, wanted to sell women's clothing from her New Hampton salon and that "there was a few lines that were being carried in Threads that [Kotz] was interested in."[5]

---

[3] At trial, Winter-Havel described different out-of-town markets where retailers could buy gifts and clothing in a convention-like setting.

[4] The full article states:

> Seller shall not, directly or indirectly, engage in any business which manufactures, distributes or markets women's clothing in Chickasaw County. Seller agrees that in the event of the breach or imminent breach of this Section 8.1 by Seller, the Buyer will have no adequate remedy at law. Seller therefore agrees that Buyer's remedies upon a breach or imminent breach of this section 8.1 by Seller include, but are not limited to, preliminary and permanent injunctive relief restraining Seller from any further breach of this section as well as an equitable accounting of all profits or benefits arising out of such breach, in addition to any other remedies available to Buyer at law or in equity.

[5] Winter-Havel and Kotz were long-time close friends.

Lukes inquired whether Kotz asked Winter-Havel for help with the new business venture. Winter-Havel said "yes" but told Lukes that "morally and legally I can't do that." Yet by July, Lukes discovered promotions on Facebook for clothing lines previously carried by Threads that were being sold at Expressions—Kotz's hair salon. Winter-Havel claimed that she bought $18,000 worth of clothing inventory for delivery in 2020 and—after ending her consignments at Threads—gave it to Kotz.

Lukes sent Winter-Havel a cease-and-desist letter. It did no good. Soon Lukes again saw social media advertisements for Expressions showcasing Winter-Havel's inventory. Lukes sent another cease-and-desist letter. Winter-Havel called her, and they had a "sit-down conversation" in which Winter-Havel denied any involvement in Kotz's salon. But when Lukes realized that Winter-Havel continued to help Kotz sell the clothing lines, Lukes petitioned the district court for injunctive relief. Lukes later moved to amend her petition to conform to the evidence, seeking damages for Winter-Havel's breach of the noncompete clause. The court granted the motion.

At trial, Winter-Havel admitted buying inventory and passing the invoices to Kotz to pay. Still, Winter-Havel insisted that she did not violate the noncompete clause because she did not profit from the sale of the inventory at Expressions. She also testified that she followed the advice of her attorney. Both Winter-Havel and Kotz denied that Winter-Havel helped Kotz enter the clothing business. But the court did not find them to be credible witnesses.

The court found that Winter-Havel's actions "violated both the spirit and letter of the parties' non-competition clause." It held that Winter-Havel "directly and

indirectly distributed or marketed women's clothing in Chickasaw County, Iowa, through receiving new inventory at Blue Iris for [Kotz], for participating in paying for shoes and clothing for [Kotz], for permitting her inventory to be marketed by Expressions on social media," and "for permitting the inventory to be sold at Expressions Salon." It awarded damages to Lukes in the amount of $5752.79 for lost profits (the twenty percent Lukes could have made on the inventory Winter-Havel removed in July 2020); $15,872.70 for loss of revenue, loss of potential business, and loss of the benefit of the bargain (for the remaining fifteen months of their noncompete); and $5000 in trial attorney fees. Winter-Havel appeals.

## II. Scope and Standard of Review

The parties disagree on the standard of review. Winter-Havel contends that this case was tried in equity and thus review is de novo. Lukes argues the case was tried at law and review is for error correction. We agree with Lukes. This action stems from the breach of a noncompete clause in a contract. We review contract actions for the correction of legal error. *Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013). "We are bound by the district court's findings of fact if they are supported by substantial evidence." *Sutton v. Iowa Trenchless, L.C.*, 808 N.W.2d 744, 749 (Iowa Ct. App. 2011).

## III. Analysis

### A. Did Winter-Havel breach the noncompete clause?

Winter-Havel contends that she did not violate the noncompete clause because the items she ordered for delivery in 2020 were not ordered for Kotz. Winter-Havel also claims that, contrary to the district court's findings, she did not buy shoes and clothing for Kotz to sell. Rather, Kotz paid the vendor directly.

Winter-Havel insists that the "the District Court's finding of key facts is wholly unsupported by the evidence presented at trial."

To show that Winter-Havel breached their noncompete clause, Lukes had to prove: (1) a contract existed, (2) non-competition was a condition of the contract, (3) Lukes performed all conditions of the contract, (4) Winter-Havel breached the noncompete clause, and (5) Lukes suffered damages from Winter-Havel's breach. *See Sutton*, 808 N.W.2d at 753. Winter-Havel insists that Lukes did not prove the last two elements because Winter-Havel did not profit from the sale of her inventory at Expressions.

In ruling against Winter-Havel, the district court relied on *Uptown Food Store, Inc. v. Ginsberg* for the proposition that a party breaches a noncompete agreement despite not deriving profit from the competing business. 123 N.W.2d 59, 65−66 (Iowa 1963). On appeal, Winter-Havel tries to distinguish *Uptown*, where a father helped his son open a supermarket in violation of a negative covenant in a lease. In that case, the court found that the elder Ginsberg, on top of financing the operation, "performed substantially all of the services of a manager or owner on a daily basis" at his son's grocery business. *Id.* at 66. Winter-Havel contends that unlike Ginsberg, she was not involved in financing or managing Kotz's business. Instead, Winter-Havel claims that she "simply gave her leftover inventory" to Kotz.

Winter-Havel insists that the facts of *Thomas v. Thomas Truck & Caster Co.*, 228 N.W.2d 52 (Iowa 1975), are more analogous. There, a company's founder agreed "not to engage as consultant or otherwise to any competitor" of the company. *See Thomas*, 228 N.W.2d at 54. The founder then loaned his son, the

vice president of a direct competitor, money knowing the son would use it to advance that business. *See id.* The court found that the language of the covenant lent "no direct support to the theory Thomas contracted away his right to make loans or gifts to his son." *Id.* at 56.

We believe that the district court properly relied on *Uptown* for the proposition that Winter-Havel could breach the noncompete clause without proof that she directly profited from Kotz's sale of the merchandise at Expressions. Substantial evidence supported the district court's finding that Winter-Havel permitted her inventory to be sold by Kotz. And whether Winter-Havel profited from that arrangement was not relevant to the question of breach. As the court explained in *Uptown*, the test for violating a noncompete clause "is mischief." *Id.* at 66 (citation omitted). And the mischief begins when the party's conduct interferes with the business that is the subject of the contract. *See id.* The reasonable and probable result of Winter-Havel's actions was to take business away from Lukes. By her efforts, Winter-Havel increased Threads's competition, which is what she agreed not to do. *See id. Thomas* does not stand for an opposite proposition; it interprets a narrower noncompete clause. *See Thomas*, 228 N.W.2d at 56.

True, Winter-Havel may not have ordered the clothing inventory with Kotz in mind. But facilitating Kotz's access to the same product lines sold by Lukes— knowing Kotz would sell them—counted as distributing or marketing women's clothing in Chickasaw County in violation of the noncompete clause. The court also found Winter-Havel and Kotz were not credible witnesses. We are bound by such findings. *See Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 182 (Iowa

2010). Thus, we find no error in the court's decision finding Winter-Havel breached the noncompete clause.

## B. Did the court properly calculate damages?

Expecting that we might uphold the district court's finding of breach, Winter-Havel argues in the alternative that the court's damage award is not supported by the evidence. She claims that Lukes did not offer proof that her business suffered because of the breach. Winter-Havel next contests the court's computation of Lukes's lost consignment income without any discount for out-of-date or unsold inventory. Winter-Havel also accuses the court of awarding "duplicative damages"—compensating Lukes twice for the inventory in stock.

Lukes counters that Winter-Havel's inventory was not an "excluded asset" in the purchase contract, and Lukes had a reasonable expectation that the inventory would continue to be sold at Threads. She maintains that the district court's computation was within the range of evidence presented at trial.

We find no error in the court's award of damages. As a guiding principle, we recognize "a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages." *Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 309 (Iowa 1998). "If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis from which the amount can be inferred or approximated." *Orkin Exterminating Co. v. Burnett*, 160 N.W.2d 427, 430 (Iowa 1968). "While the measure of damages in an action for the breach of an agreement by the seller not to re-enter business in competition with the buyer is usually difficult of exact computation, [she] who is damaged will not be precluded from recovering because of that fact." *Id.* (citation omitted). The

*Orkin* court explained that "[t]he measure of the damages resulting from the wrongful breach of an agreement not to compete is the loss naturally resulting from the breach, including loss of profits." *Id.* at 429.

The district court found that the value of the inventory Winter-Havel removed from Threads in July 2020 was $28,763.95. It awarded $5752.79 in lost profits based on the twenty percent Lukes could have earned if the inventory were sold from Threads. It also found that Lukes should recover the loss of revenue, potential business, and loss of benefit of the bargain. The court arrived at that figure based—not on the value of the inventory removed—but on the average total sales that Lukes made each month when Winter-Havel's inventory was in the store. Multiplying that number ($1058.18) by the fifteen-month (July 2020 through September 2021) duration of the noncompete clause, the court calculated those lost-opportunity damages at $15,872.70. Because those amounts cover different losses, we see no duplication.

Damages of this nature are difficult to calculate. *Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.*, 599 N.W.2d 684, 693 (Iowa 1999). And the court as fact finder has flexibility and considerable discretion when determining damages "based upon a fair and impartial consideration of all the evidence." *Glascock v. Covenant Med. Ctr., Inc.*, No. 21-0870, 2022 WL 2824734, at *4 (Iowa Ct. App. July 20, 2022) (citation omitted). The district court made a thoughtful calculation of Lukes's losses based on the record before it. Thus, we find substantial evidence supporting the damage award.

### C. Is Lukes entitled to appellate attorney fees?

Lastly, Lukes requests appellate attorney fees under Iowa Code section 625.22 (2023). That section provides, "When judgment is recovered upon a written contract containing an agreement to pay an attorney fee, the court shall allow and a tax as part of the costs a reasonable attorney fee to be determined by the court." Iowa Code § 625.22(1); *see Bankers Tr. Co. v. Woltz*, 326 N.W.2d 274, 278 (Iowa 1982) (noting statute that justifies awarding attorney fees in the trial court also justifies awarding attorney fees on appeal).

Winter-Havel agrees that if she violated the noncompete clause, Lukes is entitled to reasonable appellate attorney fees under their contract. Counsel for Lukes submitted an affidavit asserting that his post-trial and appeal fees add up to $5175. Finding that amount reasonable, we order Winter-Havel to pay Lukes for those appellate attorney fees.

**AFFIRMED.**